IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| KAYLA WEST, | : | |
| Plaintiff, | : | |
| v. | : | |
| DJ MORTGAGE, LLC, | : | CIVIL ACTION NO. |
| | : | 1:15-CV-0397-AT |
| Defendant. | : | |

### **ORDER**

This matter comes before the Court on Defendant DJ Mortgage LLC's Motion to Dismiss [Doc. 6]. Plaintiff Kayla West filed this suit seeking relief under the Fair Housing Act of 1968 ("FHA") as amended, 42 U.S.C. § 3601, *et seq.* Plaintiff alleges sexual discrimination and unlawful interference with her rights under the FHA arising from her rental of a single-family home from DJ Mortgage. DJ Mortgage argues that West failed to plead facts sufficient to state a claim. For the reasons set forth below, the Court **DENIES** Defendant DJ Mortgage's Motion to Dismiss.

### I.     **STANDARD FOR MOTION TO DISMISS**

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. *Bell Atlantic v. Twombly*, 550 U.S. 544, 555–56 (2007); Fed. R. Civ. P. 12(b)(6). The plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds

upon which it rests. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)); Fed. R. Civ. P. 8(a). In ruling on a motion to dismiss, the court must accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff. *See Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003).

A claim is plausible where the plaintiff alleges factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff is not required to provide "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The plausibility standard requires that a plaintiff allege sufficient facts "to raise a reasonable expectation that discovery will reveal evidence" that supports the plaintiff's claim. *Id.* at 556. A complaint may survive a motion to dismiss for failure to state a claim even if it is "improbable" that a plaintiff would be able to prove those facts and even if the possibility of recovery is extremely "remote and unlikely." *Id.*

## II. BACKGROUND

In early August 2013, West, a single mother with four children, emailed DJ Mortgage after seeing its Craigslist advertisement regarding a single family home it had available for rental. (Compl. ¶ 12.) At the time of West's email, Gene Andrews was one of DJ Mortgage's Property Managers, and was responsible for

handling maintenance requests, collecting rent, and taking care of tenant needs for the home in question. (*Id.* ¶¶ 10–11.) Andrews responded to West on behalf of DJ Mortgage and agreed to rent the home to her. (*Id.* ¶ 13.) After Andrews agreed to rent the home to West, he told West, "I'm gonna need you to give me a hug." (*Id.*) West brushed this comment off, because she did not consider it to be a serious sexual advance from Andrews. (*Id.* ¶ 42.)

A few days later, Andrews arranged to meet West in a parking lot so that she could receive her house keys and sign documents necessary to rent the home, including the rental lease. (*Id.* ¶¶ 15–17.) At this meeting, Andrews made a far more serious sexual advance towards West. While West sat in the passenger seat of Andrews' car and signed the rental lease and lead paint forms, Andrews reached over to the passenger seat, lifted West's skirt, and grabbed her genitals. (*Id.* ¶ 17.) West slapped Andrews' hand away, exited the vehicle, and drove away in her car. (*Id.* ¶¶ 17–18.) Despite Andrews' actions, West still decided to rent the house from DJ Mortgage, because she needed somewhere to live with her four children and had already paid her rental deposit. (*Id.* ¶ 19.)

Andrews' advances continued after West moved into the house. For example, on August 23, 2013, West requested that Andrews repair a bedroom door that had fallen off its hinges. After several days of delay, Andrews indicated that a repairmen was being sent out, then promptly asked West on a date, which she declined. (*Id.* ¶ 22.) Only two days after this incident, West contacted Andrews about a burst pipe, and Andrews again asked West on a date. (*Id.* ¶ 26.)

After West again politely declined, a repairman came out to the house, but only fixed the burst pipe itself and did not repair "the soaked wall or remedy the other effects of the [resultant] flooding." (*Id.* ¶ 28.) And just a few weeks later, on September 21, 2013, Andrews requested that West send him a nude picture. West had asked that Andrews send someone to repair mite-infested carpeting. After that repair was completed, West thanked Andrews. Andrews responded by saying, "You welcome. Maybe I can come get my pic." After West responded "Which one?" Andrews replied by saying "The where [sic] I can see all that sexiness." (*Id.* ¶ 35.) West declined all of Andrews' requests. (*Id.* ¶¶ 23, 26, 36.)

On those occasions where Andrews did not request a date or nude pictures from West in connection with her repair requests, he allegedly ignored those requests or threatened her with eviction. (*Id.* ¶¶ 22, 35, 42.) For example, West complained that her furnace was not working on September 14, 2013. In response, Andrews "said that he could get her out, and put other tenants in the property who would not ask that he provide the services and repairs that she was requesting." (*Id.* ¶ 33.) And Andrews failed to fix West's refrigerator and furnace in late September of 2013. When West inquired specifically about the fridge and indicated that her food was going bad, he responded by saying "Do what you have to do." (*Id.* ¶¶ 38–39.)

West informed DJ Mortgage of these facts in a letter she sent to it on October 21, 2013. There, she wrote:

4

> every time [Andrews] did something to my home he asked for naked picture or asked to talk privately on the phone which I did not respond[,] so I'm afraid of being homeless because I did not give in to his actions, everything that's been going on I've become stressed with anxiety and panic attacks.

(*Id.* ¶ 42.)

West explained in the letter that during the two months she had been a tenant she experienced multiple problems with the house. Along with the problems described above, the air conditioner had stopped working, the toilet in the master bedroom was rendered useable, a kitchen sink pipe burst, there was water damage to the carpet in the family room, and mold grew in the walls. (*Id.*) West also explained in the letter that Andrews lifted up her skirt and touched her genitals while she signed the house's rental lease and lead paint forms, and that Andrews asked her for a naked picture after he had carpet removed from the house. (*Id.*) Because West did not receive a response to the first letter, she sent DJ Mortgage another copy of the letter several days later certified with proof of delivery. (*Id.* ¶ 43.)

For approximately a month following the first letter that West sent, "DJ Mortgage did nothing to indicate that it was concerned about her charges that [Andrews] had groped her, demanded nude photos and sex, in return for performing repairs." (*Id.* ¶ 44.) In fact, even after West notified DJ Mortgage that Andrews molested her and was abusing his position of power, DJ Mortgage directed Andrews, West's alleged harasser, to contact West about her continued maintenance requests to repair the furnace.  (*Id.* ¶ 46.)

On November 16, DJ Mortgage sent West a response letter. West immediately responded by calling DJ Mortgage's manager, Will Thompson. (*Id.* ¶¶ 52, 54.) Because DJ Mortgage did not return her call, West sent Thompson a letter on November 18 informing him again that her furnace was not fixed, and that mold in the house was causing her children to experience illness, asthma attacks, nose bleeds, and headaches. (*Id.* ¶ 55.) Shortly thereafter, on November 20, West met with Will Thompson and Dean Tilman, DJ Mortgage's owner. (*Id.* ¶ 56.) At this meeting, West showed them the text messages that she had received from Andrews during her tenancy and let Thompson know that she would not continue to pay rent as long as she felt the house was uninhabitable. (*Id.* ¶¶ 56–57.) A few days after the meeting, West received an undated letter from DJ Mortgage informing her that Andrews was no longer with DJ Mortgage. (*Id.* ¶ 58.) West alleges that Andrews was let go because he was demanding sex in return for reduced rent from other DJ Mortgage tenants. (*Id.* ¶ 60.)

West continued to experience problems with the home's conditions even after the departure of Andrews. (*Id.* ¶¶ 63, 69–70.) For example, in December 2013, the house's furnace stopped working again, causing the home's temperature to drop to 46 degrees, and forcing West and her four children to stay in a motel or with a neighbor throughout almost the entire 2013-14 winter and spring. (*Id.* ¶¶ 62, 69.) West sent repeated communications to DJ Mortgage concerning this problem, and in one of those e-mails, included a picture of her thermostat showing that the temperature in the house was 46 degrees. (*Id.* ¶ 62.)

West decided to withhold rent during this time because of the uninhabitable and unbearably cold condition of the house. (*Id.* ¶¶ 57, 69–70.) West also informed DJ Mortgage that she would resume paying rent "[a]fter DJ remedied the problems that were making the home uninhabitable." (*Id.* ¶ 58.)

DJ Mortgage subsequently began an eviction proceeding against West because of her failure to make rent payments. The eviction suit resulted in her eviction on May 15, 2014. (*Id.* ¶ 73.) On February 10, 2015, West filed a Complaint against DJ Mortgage that included sexual discrimination claims and an unlawful interference claim pursuant to the FHA. (*Id.* ¶ 1.) On April 7, 2015, DJ Mortgage filed its present Motion to Dismiss, arguing that West has failed to state a claim.

### III. ANALYSIS

#### A. FHA Sexual Harassment Claims

Section 818 of the FHA, 42 U.S.C. § 3617, prohibits sexual discrimination in connection with the "sale or rental of a dwelling." 42 U.S.C. § 3617; 42 U.S.C. § 3604(b); *Butler v. Carrero*, No. 1:12-cv-2743-WSD, 2013 WL 5200539, at *7 (N.D. Ga. Sept. 13, 2013).

Sexual harassment qualifies as sexual discrimination under the FHA if that harassment alters the terms or conditions of the rental of the property for the tenant. *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999); *see also Butler*, 2013 WL 5200539, at *7 (stating the rule for a

FHA sexual harassment case).[1] More specifically, sexual harassment is actionable when behavior towards the tenant: (1) creates a hostile housing environment; or (2) constitutes quid pro quo sexual harassment. *See Tagliaferri v. Winter Park Hous. Auth.*, 486 F. App'x 771, 774 (11th Cir. 2012) (declining to decide whether sexual harassment is actionable under the FHA, but assuming that it was for the purposes of assessing a factually deficient complaint). The Court holds that West has sufficiently pled both types of sexual harassment here.

### 1. The Plaintiff Sufficiently Pled a Hostile Housing Environment Claim

A tenant seeking to state a hostile housing environment claim must allege: "(1) that he or she belongs to a protected group; (2) that the [tenant] has been subject to unwelcomed sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the [tenant]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of [the tenancy] and create a discriminatorily abusive [living] environment; and (5) a basis for holding the [lessor] liable." *See Mendoza*, 195 F.3d at 1245 (describing the

---

[1] In sexual harassment cases under the FHA, courts often rely on sexual harassment cases arising under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000(e) *et seq. See Tagliaferri v. Winter Park Hous. Auth.*, 486 F. App'x 771, 774 (11th Cir. 2012) (applying Title VII sexual harassment standards to a FHA sexual harassment case when the parties agreed that sexual harassment under the FHA must be considered sufficiently severe or pervasive like in employment sexual discrimination cases); *see also Butler*, 2013 WL 5200539, at *7 n.13 (stating that in sexual harassment cases under the FHA courts often rely on sexual harassment cases arising under Title VII); *DiCenso v. Cisneros*, 96 F.3d 1004, 1008 (7th Cir. 1996) (applying Title VII standards to analyze a FHA hostile housing environment claim).

8

elements of hostile environment sexual harassment claims in the employment discrimination context); *Tagliaferri*, 486 F. App'x at 774 (declining to decide whether sexual harassment is actionable under the FHA, but citing *Mendoza* as supplying the standard for sexual harassment claims).

Defendant's primary contention is that the conduct alleged is not sufficiently severe or pervasive to state a hostile housing environment claim. *Id.*; *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986). Simple teasing, offhand comments, and isolated incidents that are viewed only as annoying or offensive are not sufficiently severe or pervasive to support a FHA hostile housing environment claim. *Butler*, 2013 WL 5200539, at *7. Rather, the conduct must be "serious, persistent, and explicitly humiliating or threatening conduct." *Tagliaferri*, 486 F. App'x at 774. Even one act of harassment, if it is severe enough, may support a claim for sexual harassment. *Worth v. Tyler*, 276 F.3d 249, 268 (7th Cir. 2001). For example, direct contact of an intimate body part will typically support such a claim. *Id.*

In *Cobb v. Sunshine Rest. Merger Sub, LLC*, a Title VII hostile work environment case, a female employee of the defendant approached the male plaintiff from the rear while he was working, reached her arm around his body, and grabbed his genitals on two different occasions. *Cobb v. Sunshine Rest. Merger Sub, LLC*, No. 8:09-cv-2639-T-26MAP, 2011 WL 87310, at *1, 3 (M.D. Fla. Jan. 11, 2011). The court found that grabbing the plaintiff's genitals was

9

"physically threatening and humiliating" and denied the defendants' motion for summary judgment. *Id.* at \*2.

Here, Andrews made unwelcome sexual advances towards West, and grabbed West's genitals. (Compl. ¶¶ 15–17.) West met Andrews at his car to receive keys for the house and sign the house's rental lease and lead paint forms, Andrews reached over to the passenger seat, lifted up West's skirt, and grabbed her genitals. (*Id.*) This conduct by itself is humiliating enough to state a claim for sexual harassment.

Furthermore, on three other occasions, Andrews made unwelcome advances towards West by asking her on dates and by asking her for a "pic" of herself in conjunction with his oversight of home repairs for which West needed assistance. (*Id.* ¶¶ 22, 25, 35.) Thus, the totality of Andrews' actions, including his sexual advances towards West and his grabbing of her genitals, subjected West to "physically threatening and humiliating" experiences similar to the plaintiff in *Cobb.* 2011 WL 87310, at \*2; *see also Beliveau v. Caras*, 873 F.Supp. 1393, 1398 (C.D. Cal. 1995) (holding that the plaintiff sufficiently pled a hostile housing environment claim, when the plaintiff included in the complaint that the landlord made "off-color, flirtatious, and unwelcome remarks," and touched her breasts and buttocks when he came to make repairs). The Court finds that West has alleged sufficient facts to demonstrate severe or pervasive conduct, and therefore has adequately pled a FHA hostile environment claim in the FHA context.

### 2. The Plaintiff Sufficiently Pled a Quid Pro Quo Sexual Harassment Claim

In addition to the hostile environment claim, West claims quid pro quo sexual harassment. Quid pro quo sexual harassment exists when the tenant's terms, conditions, or privileges of the tenancy are conditioned upon whether the tenant submits to the landlord's sexual requests. *Honce v. Vigil*, 1 F.3d 1085, 1089 (10th Cir. 1993); *Shellhammer v. Lewallen*, 770 F.2d 167 (6th Cir. 1985) (claim that landlord had "made [plaintiffs'] tenancy subject to sexual consideration" stated claims under FHA); *see also Butler*, 2013 WL 5200539, at *7.

Quid pro quo harassment occurs when housing benefits are explicitly or implicitly conditioned upon sexual favors. *U.S. v. Hurt*, 676 F.3d 649, 654 (8th Cir. 2012). In *Grieger v. Sheets*, the landlord refused to make, and made it more difficult for the plaintiff tenant to get repairs after she denied his demand for sex. No. 87 C 6567, 1989 WL 38707, at *1, 3 (N.D. Ill. 1989). After the tenant rejected the landlord's demand to have sex with him, the landlord threatened the tenant that he could make things difficult for her. *Id.* at *1.

Even though the landlord never explicitly asked the tenant for sex again after this incident, he indifferently delayed or failed to make certain repairs for the house throughout the remainder of the plaintiff's tenancy. *Id.* at *1. Because the landlord deprived the tenant of certain benefits of the tenancy after she

11

denied his sexual advances, her FHA quid pro quo sexual harassment claim survived summary judgment. *Id.* at *5.

Here, Andrews' failure and delay in making repairs after West repeatedly rejected his advances shows that West's housing benefits were implicitly conditioned upon her giving sexual favors. (Compl. ¶¶ 24, 30, 33, 38, 42.) For example, after West slapped Andrews' hand away when he grabbed her genitals and declined Andrews' date invitations, Andrews responded to West's maintenance request in a hostile manner by stating that he could get her removed from the property. (*Id.* ¶¶ 17, 22, 25, 33.) Furthermore, Andrews indifferently responded to maintenance requests from West and never fixed her broken refrigerator after she decided not to give him a "pic" of herself. (*Id.* ¶¶ 35–36, 38–39.) As West herself noted in her letter to DJ Mortgage, "every time [Andrews] did something to my home he asked for naked picture[s] or asked to talk privately on the phone." (*Id.* ¶ 42.) West in turn alleges that she was "afraid of being homeless because I did not give in to his actions." (*Id.*)

Based on the pattern of facts alleged, the Court finds that West sufficiently pled a FHA quid pro quo sexual harassment claim. Although Andrews did not explicitly condition West's housing benefits on sexual favors, such an inference is clearly plausible based on his communications and course of conduct. *Quigley v. Winter* provides an analogous example with similar (and arguably weaker) facts. 598 F.3d 938, 947–48 (8th Cir. 2010). There, the Eighth Circuit affirmed a jury verdict of quid pro quo sexual harassment in an FHA context, holding that a

reasonable jury could draw an inference that the landlord conditioned returning a tenant's rental deposit on receiving a sexual favors. *Id.* The landlord "fluttered his hand against [the plaintiff's] stomach and said, '[m]y eagle eyes have not seen everything yet'" after the plaintiff asked for her deposit. *Id.* at 948. Here, Plaintiff has plausibly alleged that her housing benefits were conditioned upon her performing sexual favors for or going on dates with Andrews. West has alleged that when she asked for assistance after she rebuffed Andrews' advances, Andrews was indifferent, and would delay, or neglect to make repairs to the house. The fact that Andrews grabbed West's genitals at the beginning of her tenancy and asked for nude pictures of West after he made repairs reinforces the inference that his overall pattern of conduct was intended to coerce West into dating or providing sexual favors in exchange for obtaining habitable housing. Drawing all inferences in favor of the Plaintiff, West states a plausible claim for quid pro quo sexual harassment.

### 3. The Plaintiff Sufficiently Pled an Interference Claim

Finally, DJ Mortgage seeks to dismiss West's interference claim. A plaintiff asserting an interference claim under the FHA must allege that: (1) the plaintiff is a member of a protected class under the FHA; (2) who was engaged in the exercise or enjoyment of a right protected by the FHA; (3) the defendant coerced, threatened, intimidated, or interfered with the plaintiff's exercise of those FHA rights; and (4) defendant was motivated at least in part by an intent to

discriminate. *Bloch v. Frischholz*, 587 F.3d 771, 782 (7th Cir. 2009). West has met her burden here easily.

West pleads that Andrews engaged in a pattern of harassing and abusive behavior, beginning when she met with him to sign her lease, which lasted for months. According to West, "every time [Andrews] did something to my home he asked for [a] naked picture or asked to talk privately on the phone." (Compl. ¶ 42.) When West refused those advances, Andrews responded by ignoring West's reasonable repair requests. When West reported her complaints about Andrews to DJ Mortgage – which was "protected conduct" – DJ Mortgage "did nothing to indicate that it was concerned about her charges that [its] employee had groped her, [and] demanded nude photos and sex" in return for performing repairs. In fact, it instructed Andrews to contact West about repairing her furnace even after learning of West's allegations against him. (*Id.* ¶¶ 44–46.)

Although he was allegedly told to do so, Andrews did not perform the repairs. The Complaint alleges that even after Andrews was purportedly fired for extracting rent reductions from other tenants in return for sexual favors, DJ Mortgage continued Andrews' pattern of failing to respond to West's repair requests. (*Id.* ¶¶ 58, 60, 62, 64–67) As a result, West's furnace was broken during almost the entire 2013-14 winter, and the temperature in her home – where she lived with her children – dropped to as low as 46 degrees, forcing her to take her family to live in a hotel or with a neighbor for months at a time.

(*Id.* ¶¶ 50–51, 62, 69.)  West complained to DJ Mortgage repeatedly throughout this time, and elected to withhold her rent.  (*Id.* ¶¶ 50-71.)  After West withheld rent because Andrews allegedly only performed repairs in exchange for "sexts," and after DJ Mortgage allegedly failed to repair a furnace for months at a time, DJ Mortgage moved to evict her.

These facts plausibly suggest that DJ Mortgage considered West a problem tenant because of her complaints about sexual harassment, failed to make crucial repairs to her home, and evicted her under the pretext of her withholding rent (which, to complete the circle, only started because of Andrews' sex-for-repairs harassment in the first place).  This sort of retaliatory conduct is indicative of both interference and intent.  *See Hall v. Lowder Realty Co., Inc.*, 160 F. Supp. 2d 1299, 1322 (M.D. Ala. 2001) (denying defendant summary judgment on a Section 3617 retaliation claim filed by real estate agent when there was evidence that defendants cut off plaintiff's communications with customers because she encouraged them to vindicate their FHA rights); *Woods-Drake v. Lundy*, 667 F.2d 1198 (5th Cir. 1982) (discriminatory constructive eviction is actionable under the FHA).

DJ Mortgage's arguments on this issue can't escape the fact that this Court must take West's allegation as true.  It argues that West withheld her rent, which "justif[ied] Defendant's decision to evict her from the Property and . . . provide[d] an independent, non-discriminatory basis for that action that does not violate federal law."  (Motion at 11.)  But as Plaintiff correctly points out, "[b]y suggesting

alternative motivations, Defendant has only pointed out that questions of fact exist as to Defendant's subjective intent, which preclude dismissal of Plaintiff's claim." (Resp. at 10.) Discriminatory intent does not always wear a top hat, twirl its mustache and cane, and laugh maniacally like an out-in-the open super villain. Plaintiff's claim appears more subtle. In essence, she alleges that the Defendant silently refused, during winter, to repair her furnace after she had accused its employee property manager of sexual harassment, compelling her to temporarily move to a hotel and withhold rent in response, and then evicting her. At this stage, Plaintiff's allegations are the ones given weight. Defendant will have its chance to present evidence and demonstrate it had a non-discriminatory basis to evict West at summary judgment or trial.

### B. Res Judicata Does Not Bar West's Request for Equitable Relief under the FHA

DJ Mortgage argues that the FHA unlawful interference claim should be dismissed because of res judicata. It argues that the Magistrate Court of Rockdale County's eviction decision against Ms. West is preclusive, and that she should have raised her interference claim in that court.

Under Georgia law, res judicata precludes re-litigating claims that (1) could have been adjudicated in a previous case (2) between identical parties which was (3) finally adjudicated on the merits by a court of competent jurisdiction. *Waldroup v. Green Cty. Hosp. Auth.*, 463 S.E.2d 5, 7 (Ga. 1995); *Starship Enters. of Atlanta, Inc. v. Coweta Cty.*, 708 F.3d 1243, 1253 (11th Cir. 2013).

16

Defendant's problem here is that the Magistrate Court of Rockdale County was not a "court of competent jurisdiction" to entertain Plaintiff's FHA claims. In Georgia, "Magistrate courts . . . [are] courts of limited jurisdiction." GA. CONST. art. VI, § 1, ¶ I; *see also* O.C.G.A. § 15-10-2. The Georgia Constitution provides that superior and appellate courts, rather than magistrate courts, are able to grant equitable relief to a plaintiff. GA. CONST. art. VI, § 1, ¶ IV; *Adams v. Madison Cty. Planning & Zoning*, 271 Ga. App. 333, 334 (Ga. Ct. App. 2005). Georgia courts have regularly held that res judicata does not bar a defendant to a dispossessory action from bringing claims in a separate suit concerning the same subject matter so long as those claims seek relief that a magistrate court could not grant. *E.g.*, *Setlock v. Setlock*, 688 S.E.2d 346, 348–49 (Ga. 2010) (dispossessory judgment did not bar plaintiff from bringing claims in superior court for quiet title and injunctive relief); *WPD Ctr., LLC v. Watershed, Inc.*, 765 S.E.2d 531, 533 (Ga. Ct. App. 2014) ("Because the magistrate court was not a court of competent jurisdiction to resolve . . . claims [exceeding the court's jurisdictional amount in controversy cap] on the merits, the trial court correctly ruled that the doctrine of res judicata did not bar Watershed from reasserting the same claims in the present suit").[2] This arises frequently in the post-foreclosure eviction context, where tenants at sufferance are barred from litigating the validity of a foreclosure in a dispossessory action. *E.g., Myers v. N. Ga. Title & Tax Free Exch., LLC*, 527

---

[2] There may be some circumstances where a Plaintiff raises a fair housing claim in a dispossessory action in Georgia – if, for example, they waive equitable relief and any damages award over $15,000.00. However, the Court could not identify an FHA or similar appellate precedent involving such factual circumstances in Georgia.

17

S.E.2d 212, 214 (Ga. Ct. App. 1999) (because plaintiff "could not dispute North Georgia's title in the prior [dispossessory] proceeding, the doctrine of res judicata does not apply.").

Here, Plaintiff seeks equitable relief in the form of an injunction against future violations of the FHA. The Magistrate Court could not have granted that relief, even if it wanted to. Accordingly, Plaintiff's claims "could not have been adjudicated," and res judicata does not apply. *Waldroup*, 463 S.E.2d at 7.

## IV.   CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant DJ Mortgage's Motion to Dismiss [Doc. 6].

**IT IS SO ORDERED** this 19th day of February, 2016.

                                                          _____
                                                          **Amy Totenberg**
                                                          **United States District Judge**